CHARLES W. NORTH

*v.*

WEST VIRGINIA BOARD OF REGENTS *and* JAMES G. HARLOW,
PRESIDENT OF WEST VIRGINIA UNIVERSITY

(No. 13765)

Decided March 29, 1977.

*Edgar F. Heiskell, III* for appellant.

*Chauncey H. Browning,* Attorney General, *Cletus B. Hanley,* Deputy Attorney General, *James S. Arnold,* Assistant Attorney General, for appellee.

MILLER, JUSTICE:

Charles North, a fourth-year medical student, was expelled from the West Virginia University School of Medicine. He claims that the expulsion violated his constitutional right to due process.

A petition for a writ of certiorari was filed by North in the Circuit Court of Kanawha County against the West Virginia Board of Regents and James G. Harlow, President of the University, to obtain a review of the hearing procedures which led to his expulsion. The lower court rejected the writ on the basis that the petition as a matter of law did not state a prima facie case. It did recognize that certiorari was the appropriate procedural remedy, citing *Beverlin v. Board of Education of Lewis County,* ____ W. Va. ____, 216 S.E.2d 554 (1975).

It is from this adverse ruling that North brings a writ of error. Since the lower court denied the writ, we do not have available any record reflecting what transpired at the various hearings held at the University, except to the extent that they are contained in the verified petition for the writ of certiorari. However, since the case was summarily dismissed in the lower court, we need

only determine if the petition does state a claim for relief. We hold that it does.

The critical facts, as determined from the petition, are that in July, 1975, North was verbally advised by the Associate Dean of the School of Medicine that an accusation had been made that his initial application for entrance contained false information and that a hearing would be held to determine what action the administration would take.

A hearing was conducted by a committee of the faculty and administrators of the medical school, and North did attend. No formal notice of charges was given to North at or prior to the hearing. He was excluded from the hearing when the adverse information was presented to the committee, but was invited into the hearing afterwards and subjected to cross-examination as to the charges. Thereafter, the committee recommended to President Harlow that North be expelled and all of his academic credits accrued at the medical school be expunged.

Before action was taken by President Harlow on the committee's recommendations, North secured an attorney, who notified the University that North's due process rights had been violated and requested a further hearing. Subsequently, on August 19, 1975, the University sent a written notice to North setting a new hearing on September 2. This notice contained some of the allegations made against North, but did not contain reference to any rule or regulation of the University which was claimed to have been violated.

Prior to the September hearing, the following events occurred. North's attorney requested the right to attend and represent him, but this was denied. North submitted a written statement he proposed to make at the hearing, essentially admitting the truth of some of the allegations against him, pointing to his good academic record, and answering some of the allegations in the notice. This was followed by a letter from a committee

member to North, with copies to two other committee members, attacking North's personality and making further allegations against him.

At the hearing on September 2, which was composed of the same committee that heard the matter originally, North appeared without counsel and offered his explanation to the charges. No verbatim record or transcript was made of the hearing. On September 17, President Harlow notified North that his admission to the medical school was rescinded and his grades were cancelled.

North, through his attorney, then appealed the matter to the Board of Regents and, on its finding that due process had not been afforded, it remanded the matter to the University for further proceedings.

A third hearing was then held on January 8, 1976, at the University before the Committee on Student Discipline. Prior to this hearing, a written notice was given North charging him with a violation of Rule 4.02 of the Rules and Regulations Regarding Student Rights, Responsibilities and Conduct, a disorderly conduct rule. There was also a reference in the notice to a section in the West Virginia University Student Handbook pertaining to verification of records submitted with admission applications.

Petitioner sought to have his attorney attend this hearing and this request again was denied, although a professor at the University, an attorney, was present as an advisor. At the hearing, North alleges he was asked to plead "guilty or not guilty" to any or all of the charges. With certain express qualifications, he admitted the truth of certain allegations and denied others. At no time did he plead guilty to any of the charges.

Subsequently, the Committee concluded that he had plead guilty to certain of the charges and recommended his expulsion. This was affirmed by President Harlow. Following an appeal to the Board of Regents, which permitted North's attorney to file a brief and make an oral argument, North's expulsion was upheld.

The development of the law regarding students' rights to a due process hearing when expelled from school has been of rather recent origin. Its growth is largely attributed to politically active students, particularly those involved in the civil rights movement, whose activities resulted in the unrest manifested on many college campuses during the 1960's. The traditional view was that a student attending college did so as a matter of privilege and therefore had no right to complain if he were summarily expelled or suspended. *Steier v. New York State Education Commissioner*, 271 F.2d 13 (2d Cir. 1959). It has been generally recognized that the due process door opened for students in the case of *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961), *cert. denied*, 368 U.S. 930 (1961), where the court held that students expelled from Alabama State College for attempting to integrate lunchroom counters were required, under due process concepts, to have notice of the charges and an opportunity to be heard prior to being expelled.

It was not until *Goss v. Lopez*, 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975), that the United States Supreme Court required the application of due process standards in student disciplinary proceedings. While the students in *Goss* attended high school, and were suspended for ten days for disruptive conduct, the Court did not suggest that there is any differentiation of due process standards according to the level the student occupies in the educational system. The Court found that Federal Due process extends to protect a property or liberty right. It recognized that students at free public schools have sufficient entitlement to a public education to create a property interest that would prevent summary suspension.

The Court in *Goss* also concluded that students have a liberty interest which requires due process protection. Under this concept the student's good name, reputation, honor or integrity, which attributes are a part of a person's liberty, are adversely affected when a suspension is given. Thus, where the government takes arbitrary

action which damages these attributes, it violates the due process standard. In this, the Court relied upon *Board of Regents v. Roth,* 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); and *Wisconsin v. Constantineau,* 400 U.S. 433, 27 L. Ed. 2d 515, 91 S. Ct. 507 (1971).

We believe this same reasoning applies with equal force to a student at a state-supported university. His interest in obtaining a higher education with its concomitant economic opportunities, coupled with the obvious monetary expenditure in attaining such education, gives rise to a sufficient property interest to require procedural due process on a removal. From a liberty standard there can be little question that an expulsion from college damages the student's good name, reputation and integrity, even more so than an expulsion from high school. The higher the level of achievement, the greater the loss on removal.

North's petition alleges enough facts to demonstrate that he does have sufficient property and liberty interests to require due process protection under Article III, Section 10 of the *West Virginia Constitution.*[1] What must be determined in this case is the extent of due process procedure that need be afforded.

The applicable standards for procedural due process, once we leave the criminal area, may depend upon the particular circumstances of a given case. *Mathews v. Eldridge,* 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), illustrates some of the guiding principles in regard to procedural due process when the case involves a deprivation of a liberty or property interest.

*Mathews* recognized that some type of an orderly hearing is the cornerstone of procedural due process. Implicit recognition was given to the fact that the range of liberty and property interests, subject to due process proce-

---

[1] We recognize that the 5th and 14th Amendments to the United States Constitution would also afford due process protection to North under *Goss.* We prefer to base the due process consideration on the West Virginia Constitution. *See, Oregon v. Hass,* 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975).

dures before they can be withdrawn through State action, is almost infinite. Protected property interests have included a driver's license,[2] relief from garnishment of wages,[3] welfare rights[4] and dismissal from government employment.[5] *Goss* observed "... that as long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." 419 U.S. at 576, 42 L. Ed. 2d at 735, 95 S. Ct. at 737.

In the area of liberty rights, challenge has been made to government-sponsored disloyalty lists and a loyalty oath, which contained impermissive presumptions as to disloyalty,[6] the arbitrary withdrawal of security clearance of a civilian employed by a private contractor,[7] and the illegal reclassification of an exempt registrant for selective service,[8] as well as a statute authorizing the posting of a notice of known alcoholics in liquor establishments.[9]

Also bearing on the quality of due process to be afforded is that while the initial deprivation must be surrounded by some due process procedures, these may be rather minimal if there are prompt post-deprivation hearing procedures giving a fuller measure of due process to the aggrieved party. *See, North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 42 L. Ed. 2d 751, 95 S. Ct. 719 (1975).

---

[2] *Bell v. Burson*, 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (1971).

[3] *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969).

[4] *Goldberg v. Kelly*, 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970).

[5] *Arnett v. Kennedy*, 416 U.S. 134, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974).

[6] *Wieman v. Updegraff*, 344 U.S. 183, 97 L. Ed. 216, 73 S. Ct. 215 (1952).

[7] *Greene v. McElroy*, 360 U.S. 474, 3 L. Ed. 2d 1377, 79 S. Ct. 1400 (1959).

[8] *Oestereich v. Selective Service System*, 393 U.S. 233, 21 L. Ed. 2d 402, 89 S. Ct. 414 (1968).

[9] *Wisconsin v. Constantineau*, 400 U.S. 433, 27 L. Ed. 2d 515, 91 S. Ct. 507 (1971).

This Court in the past has required the application of due process standards in proceedings where governmental bodies have deprived a person of a property right. A review of some of the more significant cases in this area demonstrates that the Court has generally been content to approach the question of due process on a case by case basis.

In *State ex rel. Rogers v. Board of Education of Lewis County*, 125 W.Va. 579, 25 S.E.2d 537 (1943), a county school superintendent was removed from office by the school board, and this Court defined his due process rights as follows:

> "The superintendent, who was to enter upon a hearing by which his right to an important and profitable office for a definite term of years, should be determined, was denied the assistance of legal counsel. We unhesitatingly say that this was the deprivation of a hearing as contemplated by statute. 'A "hearing" includes the introduction of evidence, the argument of counsel, and the pronouncement of the decree'. Opinion, Hatcher, J., *Ellis v. Road Commission*, 100 W.Va. 531, 131 S.E. 7.... The intricacies of the substantive and procedural law involved were such that no layman could be expected to protect adequately his rights without legal assistance....

> "Respondents concede that no witness heard was sworn. This alone nullifies the hearing. A 'hearing' by either a judicial or a quasi-judicial tribunal contemplates the taking of evidence, and oral testimony presupposes the administration of an oath.... Nor could there be an adjudication against the superintendent by default. ..." 125 W.Va. at 589-90; 25 S.E.2d at 542.

Subsequent confirmation of these principles was made in *Beverlin v. Board of Education of Lewis County, supra*, where it was stated:

> "Beverlin was accorded actual notice, a meaningful (albeit unsuccessful) hearing, the opportunity to confront his accusers, assistance of counsel

and the availabilities of remedies for review."
____ W. Va. at ____, 216 S.E.2d at 557.

Other illustrations of the application of due process rights in procedures initiated by governmental bodies can be found in *State ex rel. Ellis v. Kelly*, 145 W. Va. 70, 112 S.E.2d 641 (1960), revocation of used car dealer license by a biased hearing officer; *State ex rel. Bronaugh v. Parkersburg*, 148 W. Va. 568, 136 S.E.2d 783 (1964), denial of hospital privileges to a physician at a city-owned hospital; *State ex rel. Bowen v. Flowers*, 155 W. Va. 389, 184 S.E.2d 611 (1971), suspension of pharmacist from pharmaceutical program administered by Department of Welfare; *State ex rel. Payne v. Walden*, 156 W. Va. 60, 190 S.E.2d 770 (1972), distress statute violative of due process procedures; *Persinger v. Edwin Associates*, ____ W. Va. ____, 230 S.E.2d 460 (1976), attachment statute sustained as sufficient under due process; *Anderson v. George*, ____ W. Va. ____, ____ S.E.2d ____ (1977), (CC898, March 1, 1977), statutory seizure of animals as countering due process.

From all of these cases, certain fundamental principles in regard to procedural due process can be stated. First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation.

These are the general due process concepts that are embodied in Article III, Section 10 of the West Virginia Constitution, and it is with these concepts in mind that we must determine North's procedural due process rights.

Petitioner North was not given a suspension, but was expelled in effect *ab initio* with all earned credits cancelled. This is the most severe penalty that can be inflicted upon a student by academic authorities. Not only is his academic career terminated at the particular insti-

tution, but his chance of successful application at another institution of higher learning is, at best, minimal. Finally, with all academic credits removed, he must begin anew.

In this type of situation a student is entitled to substantial due process protection. The standard of due process should comport with *Beverlin, supra,* and *Rogers, supra,* and require the following rights: a formal written notice of charges; sufficient opportunity to prepare to rebut the charges; opportunity to have retained counsel at any hearings on the charges, to confront his accusers, and to present evidence on his own behalf; an unbiased hearing tribunal; and an adequate record of the proceedings.

It is not possible from the meager record before this Court to determine if all of these rights were afforded North. It does appear that he was not permitted to have his retained counsel present and a question exists on whether there was any proof of the charges independent of North's explanation.

The matters surrounding the extent of procedural due process standards actually afforded North under the guidelines set in this opinion will have to be examined by the lower court. It is sufficient to state that a prima facie case has been made in the petition to warrant a full review of the procedural due process question by way of a writ of certiorari.

We recognize that the standard of due process set in this case applies to disciplinary expulsions. The same standard may well apply to lengthy suspensions which would have the practical effect of preventing the student from completing his academic program. In shorter suspensions, we adopt the holding of *Goss,* that "... the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581, 42 L. Ed. 2d at 739, 95 S. Ct. at 740.

*Goss* recognized, as do we, that there may be situations in which prior notice and hearing need not be given. Specific illustration of this exception was made as to students who present a "... continuing danger to persons or property or an ongoing threat of disrupting the academic process ..." 419 U.S. at 582, 42 L. Ed. 2d at 739, 95 S. Ct. at 740. They may be immediately removed, but are entitled to a prompt subsequent hearing.

*Goss* did not discuss removal resulting from a student's failure to maintain required academic standards. The few courts which have delved into this area have recognized that a broad discretion rests with school officials on academic dismissals and their decisions in this area are not ordinarily reviewable by the courts. *Greenhill v. Bailey,* 519 F.2d 5 (8th Cir. 1975), sets the rule and its qualifications.

As this case will be remanded to the trial court for further hearing, it is appropriate to discuss the extent of the hearing that should be afforded under the writ of certiorari.

Prior to the passage of Chapter 153 of the 1882 Acts of the Legislature, the writ of certiorari existed in a limited form and mainly served as a means of reviewing the actions of inferior tribunals to determine if they had exceeded their jurisdiction. Certiorari, however, was not appropriate if there was another available remedy. *Meeks v. Windon,* 10 W. Va. 180 (1877); *Richmond v. Henderson,* 48 W. Va. 389, 37 S.E. 653 (1900). A substantial statutory broadening of the writ of certiorari occurred in 1882 with the addition of the language that we now find in W. Va. Code, 53-3-2:

> "In every case, matter or proceeding, in which a certiorari might be issued as the law heretofore has been, and in every case, matter or proceeding before a county court, council of a city, town or village, justice or other inferior tribunal, the record or proceeding may, after a judgment or final order therein, or after any judgment or order therein abridging the freedom of a person,

be removed by a writ of certiorari to the circuit court of the county in which such judgment was rendered, or order made; . . ."

Not only was scope broadened in the sense of the type of inferior tribunals from which certiorari would lie, but the extent of review afforded was expanded under language which is now found in W. Va. Code, 53-3-3:

"Upon the hearing, such circuit court shall, in addition to determining such questions as might have been determined upon a certiorari as the law heretofore was, review such judgment, order or proceeding, of the county court, council, justice or other inferior tribunal upon the merits, determine all questions arising on the law and evidence, and render such judgment or make such order upon the whole matter as law and justice may require."

This Court recognized in *Long v. Ohio River R'y. Co.*, 35 W. Va. 333, 335, 13 S.E. 1010, 1011 (1891), that the statutory expansion made it ". . . a remedy of great importance, and constant use, and should be upheld and applied, within its proper scope, to the end of meting out substantial justice."

It should be noted that the statutory expansion still contained the restriction that certiorari does not lie in cases " . . . where authority is or may be given by law to the circuit court, . . . to review such judgment or order on motion, or on appeal, writ of error or supersedeas, or in some manner other than upon certiorari; . . ." W. Va. Code, 53-3-2. Thus, it is held that certiorari is not a substitute for an appeal or writ of error. *In re Johnson's Adoption*, 144 W. Va. 625, 110 S.E.2d 377 (1959).

As a result of the liberalization of certiorari by statute, actions taken by inferior tribunals acting in a judicial or quasi-judicial capacity, where no common law or statutory appeal rights were permitted, became reviewable by certiorari. *Reynolds Taxi Company v. Hudson*, 103 W. Va. 173, 136 S.E. 833 (1927); *Quesenberry v. State Road Commission*, 103 W. Va. 714, 138 S.E. 362 (1927);

*Town of Davis v. Davis,* 40 W. Va. 464, 21 S.E. 906 (1895).[10]

*Beverlin v. Board of Education of Lewis County, supra,* established that on a writ of certiorari the court may review the action of the lower tribunal to determine if it acted in an arbitrary and capricious manner, and if it did, its actions will be reversed. This is consonant with the expanded reach of the writ, which requires the court to review the matter upon the merits and to make such order ". . . upon the whole matter as law and justice may require." W. Va. Code, 53-3-3.

*Beverlin* was one more progression in the line of cases expanding the statutory writ of certiorari. Judge Brannon, speaking for this Court in *McClure-Mabie Lumber Co. v. Brooks,* 46 W. Va. 732, 734, 34 S.E. 921, 922 (1899), posed the questions which this Court answers in part today:

> "Code, chapter 110, section 3, says that on certiorari the court shall hear the case on the merits, deciding not only what at common law it could do upon certiorari, review the proceedings below, and 'make such order as law and justice (both words used) may require.' What does this mean? I shall not say,—it is hard to say; but it authorizes a liberality to cure such a defect as a defective or untruthful return."

The implications are obvious. To correct an untruthful return, evidence outside the record must be obtained. We, therefore, conclude that on certiorari where, as here, substantial rights are alleged to have been violated by the inferior tribunal, the circuit court is authorized to take evidence independent of that contained in the rec-

---

[10] We recognize that *State ex rel. Board of Education v. Martin,* 112 W. Va. 174, 163 S.E. 850 (1932), and *Beverlin v. Board of Education of Lewis County,* ____ W. Va. ____, 216 S.E.2d 554 (1975), state that a school teacher who is dismissed or suspended by a county board of education may seek judicial review of the board's action in the circuit court by writ of certiorari. This result arises by virtue of the peculiar wording of W. Va. Code, 18A-2-8, which makes the right of further administrative appeal discretionary with the employee.

ord of the lower tribunal to determine if such violations have occurred.[11] To hold otherwise is to frustrate the clear statutory mandate that the certiorari review satisfy the requirements of law and justice.

Upon the remand of this case, the lower court shall hold such evidentiary hearing as is necessary to determine petitioner North's claim of due process violations under the standards herein contained.

*Reversed and remanded.*

[11] In arriving at this conclusion, we are mindful that the concept of an "inferior tribunal" under the certiorari statute, W. Va. Code, 53-3-3, may involve a tribunal which, besides exercising quasi-judicial powers, also operates in administrative areas. Our holding is consistent with prior decisions of this Court as to the scope of judicial review on matters arising out of administrative agencies which exercise quasi-judicial functions. *State v. Huber*, 129 W. Va. 198, 40 S.E.2d 11 (1946); *United Fuel Gas Company v. Public Service Commission*, 73 W. Va. 571, 80 S.E. 931 (1914). It is also consistent with the extent of review afforded in contested cases under W. Va. Code, 29A-5-4(f) of the Administrative Procedures Act. W. Va. Code, 29A-1-1, *et seq.* Nor do we by our holding intend to overrule those decisions that require the exhaustion of administrative remedies before access to the courts may be obtained. *The Bank of Wheeling v. Morris Plan Bank & Trust Co.*, 155 W. Va. 245, 183 S.E.2d 692 (1971).